## HALL *et al. v.* WEAVER.

*(Circuit Court, D. Oregon.* February 29, 1888.)

1. PRINCIPAL AND SURETY—SURETY OR GUARANTOR—BOND TO SECURE ADVANCES.
   A person who executes a bond with another as his surety, conditioned for the payment of moneys advanced to the principal by the obligee therein, is a surety, and not a mere guarantor, and is not entitled to notice of the acceptance of the bond by the obligee.

2. SAME—ALTERATION OF INSTRUMENT—PROCURING ATTESTATION TO SIGNATURE OF SURETY.
   When a person executes a bond as surety, and leaves it with his principal for delivery to the obligee, and before doing so the former procures a person to attest the signature of the surety, who is not authorized to do so, such attestation is not an alteration of the instrument that impairs or affects its value as an instrument of evidence in the hands of the obligee, because it was made before delivery.[1]

*(Syllabus by the Court.)*

At Law. On motion for new trial.
*L. B. Cox,* for plaintiffs.
*Edward B. Watson,* for defendant.

DEADY, J. On December 23, 1886, the plaintiffs, citizens of the state of Illinois, and doing business in Chicago, under the firm name of T. W. Hall & Co., commenced this action against the defendant, George Weaver, a citizen of Oregon, as administrator of Hans Weaver, deceased, to recover the sum of $8,503.09, with interest from said date, as and for money theretofore advanced to W. F. Owens on the security of the bond of said Hans Weaver.

On the trial it was admitted that since the commencement of the action the plaintiffs had received from parties to said bond the sum of $3,663.10 on said demand, and the jury found a verdict for the plaintiffs for the remainder, $4,839.99, for which sum, with $171.20 costs and disbursements, the plaintiffs had judgment.

The defendant now moves for a new trial, and it will be necessary to a proper understanding of the matter to make a brief statement of the case.

It is alleged in the complaint that on January 7, 1886, the plaintiffs and W. F. Owens entered into an agreement whereby Owens was to purchase wool in Oregon, and consign the same to the plaintiffs for sale at Chicago, and on the receipt of a consignment of wool or an agreement to consign, together with a note equal to 10 cents a pound of said wool, the plaintiffs were to advance money to Owens on his drafts, to enable him to purchase wool; that in consideration of said undertaking on the part of the plaintiffs, said Owens as principal, and Robert Phipps, Noah Cornutt, and Hans Weaver as sureties, all of the county of Douglas and

---

[1] On the subject of the alteration of written instruments, see Davis v. Eppler, (Kan.) 16 Pac. Rep. 793, and note.

state of Oregon, on January 7, 1886, executed and delivered to the plaintiffs their certain writing obligatory, in and by which they acknowledge themselves "held and firmly bound unto T. W. Hall & Co. in the full sum of $20,000 gold coin of the United States, to be paid to said Hall & Co., their assigns or legal representatives, for which payment well and truly to be made we bind ourselves, our heirs, executors, and administrators, jointly and severally, firmly by these presents;" conditioned as follows: "That if the above bounden W. F. Owens shall well and truly pay unto the said Hall & Co., upon usual and proper demand, the sum or sums of money paid by said Hall & Co., or honored, so as to be paid on orders, checks, or drafts, overdrafts, notes, and demands, or any of them whatsoever, by or from said W. F. Owens, principal aforesaid, to the said Hall & Co., in course of business properly directed, then, and in that event, this bond shall become null and void, and of no effect; otherwise the same shall be, remain, and continue in full force, virtue, and effect."

It is also provided that "this bond shall not be construed so as to require the said Hall & Co. to advance any sum or sums of money except as they may see fit;" and that "the duration and existence of this bond and obligation may be terminated at the wish of the principal or any obligor," after due notice to Hall & Co., "and then only after all obligations and legal liabilities thereby assumed or arising therefrom have been fully and completely and in every respect legally discharged."

The writing purported to be signed and sealed by said Owens, Phipps, Cornutt, and Weaver, "in presence of C. M. Stephens and J. C. Simmons." Thereafter, on March 2 and April 9, 1886, and on four different days between said dates, the plaintiffs advanced Owens on his six promissory notes the sum of $8,000, of which only $322.11 was repaid by Owens; and the balance due thereon, with interest, amounted at the commencement of this action to $8,503.09.

On September 25, 1886, Owens died intestate and insolvent; and the claim has since been presented to the administrator of his estate, and allowed, but not paid for want of funds.

On May 26, 1886, Hans Weaver died, leaving a will, and on June 22, 1886, the defendant was appointed administrator with the will annexed, to whom the claim of the plaintiffs was duly presented for allowance, and by him rejected. The answer of the defendant consists of denials of any knowledge or information concerning the alleged agreement, bond, notes, and advances sufficient to form a belief.

On the trial the plaintiffs called the subscribing witness, C. M. Stephens, who testified that he signed the bond as a witness at the request of Owens, but that the other persons whose names appeared signed to the bond, as the makers thereof, were not present, and he did not see them or either of them sign the same. The plaintiffs then read in evidence the return of the marshal on a subpoena commanding him to summon J. C. Simmons, the other subscribing witness to the bond, to testify in this case, to the effect that said Simmons could not be found in the state. And thereupon, after the plaintiffs had given evidence tend-

ing to prove that the signature of Hans Weaver, appended to the bond, was his genuine signature, the same was admitted in evidence. In the course of the trial the court ruled that, (1) the addition of Stephens' name to the bond as a subscribing witness, after its execution by the makers thereof, under the circumstances disclosed in his evidence, did not affect it as an instrument of evidence in the hands of the plaintiff, and instructed the jury that if Weaver signed the bond, as alleged, he was bound by it, notwithstanding the subsequent attestation by Stephens; and (2) the writing in question is not a simple guaranty, but a direct and absolute undertaking by the makers thereof, to pay Hall & Co. the advances made by them to Owens in the course of the business in which he was engaged, and instructed the jury it was not necessary that the plaintiffs should have given Weaver notice of the acceptance of the bond.

The motion for a new trial is based on some eight grounds, but those that were noticed in the argument may be condensed into two: (1) The bond or instrument sued on is a guaranty, and unless notice of the acceptance thereof by the plaintiffs was given to the obligors or makers, they are not liable thereon; (2) the alteration of the instrument by the addition of the name of a subscribing witness, C. M. Stephens, rendered it void.

In deference to the strenuous contention of counsel for the motion for new trial I have re-examined the question whether the writing signed by Owens and Weaver on January 7, 1886, made the latter a surety for or only a guarantor of the former, and I find neither reason nor authority for holding Weaver's undertaking to be anything different from or less than that of a surety. The terms "surety" and "guarantor" are often used in the books loosely and indiscriminately. They occupy certain ground in common, but there is a marked distinction, both in the form and effect of the undertakings.

This distinction is nowhere more clearly stated than in Brandt on Suretyship and Guaranty. The author says (section 1:)

"A surety or guarantor is one who becomes responsible for the debt, default, or miscarriage of another person. The words 'surety' and 'guarantor' are often used indiscriminately as synonymous terms; but, while a surety and guarantor have this in common, that they are both bound for another person, yet there are points of difference between them which should be carefully noted. A surety is usually bound with his principal in the same instrument, executed at the same time, and on the same consideration. He is an original promisor and debtor from the beginning, and is held, ordinarily, to know every default of his principal. Usually he will not be protected, either by the mere indulgence of the creditor to the principal, or by want of notice of the default of the principal, no matter how much he may be injured thereby. On the other hand, the contract of the guarantor is his own separate undertaking, in which the principal does not join. It is usually entered into before or after that of the principal, and is often founded on a separate consideration from that supporting the contract of the principal. The original contract of the principal is not his contract, and he is not bound to take notice of its non-performance. He is often discharged by the mere indulgence of the creditor to the principal, and is usually not liable unless notified of the default of the

principal. * * * The principal and surety, being directly and equally bound, may be sued jointly in the same suit; while the guarantor, being bound by a separate contract, and only collaterally liable, cannot usually be joined in the same suit with the principal."

In *Kearnes* v. *Montgomery*, 4 W. Va. 29, it is said:

"The contract of a guarantor is collateral and secondary. It differs in that respect from the contract of a surety, which is direct; and in general the guarantor contracts to pay if, by the use of due diligence, the debt cannot be made out of the principal debtor; while the surety undertakes directly for the payment, and so is responsible at once if the principal debtor makes default."

In *Courtis* v. *Dennis*, 7 Metc. 518, it was said:

"The terms 'sureties' and 'guarantors' are often confounded, from the fact that a guarantor is, in common acceptation, a surety for another. The rules, however, of the common law as to sureties, are not strictly applied to guarantors, but rather the rules of the law merchant; and the true distinction seems to be this: That a surety is in the first instance answerable for the debt for which he makes himself responsible; and his contracts are often specialties, while a guarantor is only liable where default is made by the party whose undertaking is guarantied; and his agreement is one of simple contract."

Now, the undertaking of Weaver, within all these definitions and distinctions, is that of a surety. He became absolutely bound in the same writing and on the same consideration with his principal, Owens, to pay the plaintiffs whatever sums of money they might advance for him, concerning which he might make default. In other words, his contract and liability are the same as his principal's. He bound himself to do exactly what Owens did; and whatever was a breach of the bond as to Owens, was so as to Weaver. His undertaking was an original one, joint and several with Owens, and in no sense collateral to it.

On the other hand, this contract differs from that of a guarantor, which is separate from and collateral to that of the principal, and founded on a distinct consideration.

*Cox* v. *Machine Co.*, 57 Miss. 350, is a case on all fours with this. Cox became bound in the same instrument with Gibson to the sewing-machine company, that the latter would pay all indebtedness that he might incur to the company. Gibson made default, and in an action on the bond against Cox he insisted that he was a guarantor, and not a surety, and was not liable as such, because he had not received notice of the acceptance of the bond. The court held that Cox was liable as a surety, and not entitled to notice of acceptance of the bond. In the course of his opinion Mr. Chief Justice GEORGE cited with approbation Mr. Brandt's definition of a surety, and his statement of the difference between that and a guarantor.

The contention of counsel for the motion for new trial is largely based on the authority of three cases from the state of Michigan, namely, *Bank* v. *Kercheval*, 2 Mich. 508; *Locke* v. *McVean*, 33 Mich. 473, and *Jeudevine* v. *Rose*, 36 Mich. 54. In each of these cases a bond was signed by a person as surety with a principal, conditioned for the due performance of some act—as the payment of money—by the latter. In actions

brought on these several bonds against the sureties therein, the court held the defendants not liable on grounds which in no way involved the question whether the writings were mere guaranties or absolute undertakings for the debt or default of the principal. In the course of the opinions the terms "surety" and "guarantor" are used interchangeably and indiscriminately, without any reference to the technical distinction between them.

They are all cases of surety, and not guaranty, and were evidently decided on that assumption, no question being made as to the character or effect of the writings in this respect.

For instance, in *Bank* v. *Kercheval, supra,* the court holds that the bond given to the bank to secure future advances, not exceeding $3,000 at any one time, is a continuing guaranty, and cites *Douglass* v. *Reynolds,* 7 Pet. 113, which was a case of simple guaranty, in support of this conclusion, but refuses to follow that case so far as to hold that notice of the acceptance of the guaranty must have been given to the surety therein, because the facts of the two cases in this respect are not similar, and said, "We think no notice of acceptance other than that which the law implies was necessary in the case before us."

The latest statement of the rule requiring notice of the acceptance of a guaranty is found in *Machine Co.* v. *Richards,* 115 U. S. 527, 6 Sup. Ct. Rep. 173. In speaking for the court, Mr. Justice GRAY, after referring to *Davis* v. *Wells,* 104 U. S. 159, wherein the cases on the subject in that court from *Douglass* v. *Reynolds,* 7 Pet. 113, to *Adams* v. *Jones,* 12 Pet. 213, are reviewed, and, as I think, limited and straightened out, sums up the rules there laid down as follows:

"A contract of guaranty, like every other contract, can only be made by the mutual assent of the parties. If the guaranty is signed by the guarantor at the request of the other party, or if the latter's agreement to accept is contemporaneous with the guaranty, or if the receipt from him of a valuable consideration, however small, is acknowledged in the guaranty, the mutual assent is proved, and the delivery of the guaranty to him or for his use completes the contract. But, if the guaranty is signed by the guarantor without any previous request of the other party, and in his absence, for no consideration moving between them except future advances to be made to the principal debtor, the guaranty is in legal effect an offer or proposal on the part of the guarantor, needing an acceptance by the other party to complete the contract."

It is apparent from this summary of the rules governing the contract of guaranty that the contract sued on in this case, by which Weaver undertook directly, with and as surety for Owens, for the payment of advances made by the plaintiffs to the latter, is not such a contract.

As to the second point. The rule of the common law concerning the alteration or spoliation of writings was very strict. It was indiscriminately punitive, and did not attempt to adjust the consequences of the act according to the justice and propriety of each particular case. Accordingly, not only a material alteration made by a party to the writing without the consent of the other, but one made by a stranger without the consent of the party in whose control the instrument was, would avoid it as to the party making the alteration or having the control

thereof; and even an immaterial alteration by a party without the consent of the other would have the same effect.

Gradually the rule became relaxed or questioned as to alterations made by a stranger without the agency of the party, and even alterations made by a party, when immaterial. *Adams* v. *Frye*, 3 Metc. 104; 1 Whart. Ev. § 622 *et seq.*

Finally, a reasonable and comprehensive rule was declared in the New York Code of Civil Procedure, (§ 1794,) which is section 778 of the Code of Civil Procedure of this state. It provides:

"The party producing a writing as genuine, which has been altered, or appears to have been altered, after its execution or making, in a part material to the question in dispute, shall account for the appearance or alteration. He may show that the alteration was made by another without his concurrence, or was made with the consent of the parties affected by it, or otherwise properly or innocently made, or that the alteration did not change the meaning or language of the instrument. If he do that, he may give the writing in evidence, but not otherwise."

As there is no evidence when or under what circumstances the name of J. C. Simmons was signed to the bond as a witness to its execution, the presumption is that it was duly done, and before the delivery of the instrument. 1 Whart. Ev. § 629. The effect of signing the name of Stephens to the instrument as a witness to its execution is to require the party offering it to call him as a witness thereto, if he be living or within the state; otherwise his handwriting, as well as that of the party, must be proved. Code Civil Proc. Or. § 751.

Does it then appear how this alleged alteration is material, or is of any advantage to the plaintiffs? The party offering the bond with this signature upon it is bound to produce the subscribing witness, and examine him as to the execution thereof by Weaver, or account for his absence by showing that he is dead or without the state; and even then he must prove the handwriting of the absent witness, as well as that of the party himself; whereas, if the name of the witness was not on the bond, proof of the handwriting of the party would be sufficient. And, as was said in the case of a similar alteration, (*Adams* v. *Frye, supra,* 105:)

"The terms and stipulations originally contained in the body of the bond have not been altered in substance, nor even in letter. The attestation by one or more witnesses of the due execution of a bond is not requisite to its validity, either by common law or by statute. It is a perfect instrument, and may be enforced in a court of law without any such attestation. The change produced in the character of the instrument by this alteration is not one which thus affects in any degree the validity or construction of the contract of the parties. At most, it only operates on the course of the proceeding in a trial at law, as to the nature and kind of evidence required to prove the execution of the instrument."

It is true that, notwithstanding these suggestions, the court in *Adams* v. *Frye* held that the procurement by the obligee in a bond of the signature thereto of a person as a witness, after the delivery of the same, if done fraudulently, with a view to gain any improper advantage, would avoid the instrument as to such obligee, and that the act of procuring such sig-

nature to a bond by a person who was not present at its execution nor authorized to attest it, is *prima facie* evidence of a fraudulent intent; but this conclusion was reached under the rule of the common law, which makes the proof of the handwriting of an absent witness sufficient evidence of the execution of the instrument. *Valentine* v. *Piper*, 22 Pick. 85; 1 Whart. Ev. § 726.

This is evident from the reasons given by the court for the ruling. After stating that by this alteration a material change was made as to the nature and kind of evidence which might be relied on to prove the plaintiff's case, the court says:

"By adding to the bond the name of an attesting witness, the obligee became entitled to show the due execution of the same by proving the handwriting of the supposed attesting witness, if the witness was out of the jurisdiction of the court. It is quite obvious, therefore, that a fraudulent party might, by means of such an alteration of a contract, furnish the legal proof of the due execution thereof, by honest witnesses swearing truly as to the genuineness of the handwriting of the supposed attesting witness; and yet the attestation might be wholly unauthorized and fraudulent."

But under the statute of this state proof of the handwriting of the absent witness is not enough. The handwriting of the party must also be proved; and the result is, the alteration would, in case of the absence of the witness, cast on the plaintiffs the burden of proving his signature, as well as that of Weaver's.

On the other hand, it may be said that in the case of such an alteration with a fraudulent purpose, the party would likely be prepared to prove the signature of the conveniently absent witness beyond a peradventure, which circumstance might have weight with a jury, and induce them to find, on otherwise light and unsatisfactory evidence, that the signature of the party to the instrument is genuine, because it had been attested by a subscribing witness. And on this view of the case I am inclined, on the whole, to say with the court in *Adams* v. *Frye, supra,* 107: "It seems to us that we ought not to sanction a principle which would permit the holder of an obligation thus to tamper with it with entire impunity."

And therefore it may be safer to hold, even under the law of this state, that the procurement by the holder of a writing or an obligee in a bond of the signature of a person as a subscribing witness thereto, who is not authorized to attest the same, is *prima facie* a fraudulent alteration thereof, and unless shown to be otherwise, will avoid the instrument as to him, or prevent his use of it as evidence in an action thereon. So far I have been considering the case as made in the argument of counsel for the defendant, and insisted on by them at the trial.

But the real case is a very different one. No alteration of a writing before execution, which includes delivery, affects its character or value as an instrument of evidence. Alterations before delivery are presumed to be made with mutual consent. The very act of delivering and receiving the writing implies so much. This is the doctrine of the common law. "The period after which alterations not mutual are fatal is that of the final

delivery of the document." 1 Whart. Ev. § 625; and Code Civil Proc. (§ 778) says the same: "The party producing a writing as genuine which has been altered, or appears to have been altered, after its execution or making, in a part material to the question in dispute, shall account for the appearance or alteration."

The attestation of Stephens was made at the request of Owens, and this authorized him to attest the same, so far as Owens' signature is concerned. But the attestation being unqualified, the reasonable inference is that it included the signature of the other obligors, as well as Owens, and so it was doubtless intended.

Weaver and his co-obligors who signed this bond and left it with the principal therein to deliver to the plaintiffs, thereby constituted the latter their agent for that purpose. *Belloni* v. *Freeborn*, 63 N. Y. 389. Before the delivery was made this alteration took place. It consisted of an attestation which, for aught that appeared, was authorized and genuine. So far as the plaintiffs are concerned it was the act of Weaver and his co-sureties acting through the agent and co-obligor, Owens, prior to the delivery to them of the writing.

To hold that the value or admissibility of the writing as an item of proof or an instrument of evidence is thereby impaired or affected in the hands of the plaintiffs, would be simply monstrous.

The motion for a new trial is denied.